**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW HAMPSHIRE**

In re:

DIANE J. TACASON d/b/a
CUTTING EDGE SPORTS
　　　　Debtor

Chapter 11
Case No. 12-11879-BAH

**DEBTOR'S DISCLOSURE STATEMENT**
**DATED AUGUST 14, 2013**

## I. INTRODUCTION.

This is the disclosure statement (the "Disclosure Statement") in the Chapter 11 case of the Debtor, Diane Tacason (the "Debtor"). This Disclosure Statement contains information about the Debtors and describes the Plan of Reorganization (the "Plan") filed by the Debtors dated August 14, 2013. A full copy of the Plan is provided with this Disclosure Statement. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed in this Disclosure Statement. General unsecured creditors are classified in Class 7, and will receive a distribution of between .843% and 7.11% of their allowed claims, to be distributed in monthly installments over a 3 year period from the Effective Date.

### A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case.

- How the Plan proposes to treat claims or equity interests of the type claimants hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed).

- Who can vote on or object to the Plan.

- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan.

- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation.

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish the rights of all claimholders.

**B.     Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

> 1.     *Time and Place of the Hearing to Confirm the Plan and Approve this Disclosure Statement.*

The hearing at which the Court will determine whether to approve this Disclosure Statement and confirm the Plan will take place on September 16, 2013, at 10:00 am, in Courtroom 2, at the U.S. Bankruptcy Court, District of New Hampshire, 1000 Elm Street, 11th Floor, Manchester, NH  03101.

2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Debtor's Counsel, Michael B. Feinman, Esq. 23 Main Street, Andover, MA 01810.  See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by September 11, 2013 or it will not be counted.

3.      *Deadline For Objecting to Confirmation of the Plan or Approval of this Disclosure Statement*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Court and counsel for the Debtors, Michael B. Feinman by September 11, 2013 at 4:00 pm.

**C.      Disclaimer**

The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.   The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.

**II. BACKGROUND**

**A.      Description and History of the Debtor's Business**

The Debtor, Diane Tacason ("Diane") is an individual residing in Windham, New Hampshire and conducting her business in Woburn, Massachusetts.

In 1989, Diane met John Gray ("Gray"), and they became romantically involved. In addition, they commenced a business which they ran together for approximately 17

years. The business was eventually incorporated under the name Djaygee, Inc., and conducting business under the name Cutting Edge Sports ("CES").   The business conducted by CES consisted primarily of customizing jerseys for various athletic programs, including but not limited to academic, amateur and professional sports. Locally, CES and Diane currently service the Boston Celtics, the Boston Red Sox, Harvard University, Boston University, Boston College, as well as pro shops for these teams and others. The manner in which business has been and continues to be conducted is that the various teams ship their blank game jerseys to CES for customization has requested, including numbering, lettering, and whatever else is requested.

When Diane and Gray ran the business of CES, Diane handled almost all of the financial aspects of the business, including but not limited to bookkeeping and bill payment. Gray handled the production side of the business, doing design work for clients. Things went well, with the occasional issues that often arise between parties, until approximately 2006.

Commencing in 2006, Diane and Gray started having relationship problems. These problems commenced after the death of Diane's mother. At that time, Gray was requesting that Diane utilize funds from her inheritance for his benefit and at his direction.  This included, but was not limited to giving him money to buy a car and a building.  During this period of time, Gray had commenced dating somebody else, which Diane learned about sometime later.  Even though they were residing together, in 2007, Gray requested a friend of his who is an attorney to commence suit against Diane. While that suit was pending, various things happened, including but not limited to the commencement of additional legal proceedings in New Hampshire to sever their ownership of their residential condominium in Windham, New Hampshire. As time

progressed, Gray has continued in his pursuit and harassment of Diane. Both in telephone messages and in the presence of third parties, he has continued to threaten Diane, and utilize statements such as the following:

- "I am going after you and I will pursue you and I will take you [redacted] down do you understand Diane?"

- "You are going down. I will . . . if it takes me the rest of my [redacted] life, I will squeeze you for every [redacted] thing you have."

- "Save this recording and play it for your stupid [redacted] attorney, because you'll be seeing a lot of me. So shove your [redacted] depositions up your [redacted]. Because you and I are going at it in a [redacted] street war. Do you understand? No more gloves, no more nothing. It's a [redacted] street war now, okay? You got what you want from me. You got it baby. So get [redacted] ready cause here it comes. All the gloves are off. I'll do everything and anything to take you down, and believe me [redacted], you're [redacted] going down."

Further, in October 2007, Gray assaulted and attacked Diane in the presence of third parties. He was arrested and restraining orders were issued, which restraining orders continue in effect to the present day. He was ordered to undergo anger management training.

During the course of subsequent litigation between the parties, Diane was defaulted by virtue of an order by Massachusetts Superior Court Judge, and was not able to present the merits of her case against Gray. Instead, she ended up with a judgment against her for $252,000, all of which is still subject to appeal. In addition, during the litigation, Diane's ability to operate the business of CES, which has been hers alone since

2008, has been hampered during the litigation process by various orders. One of the orders in 2007 involved the order of the Superior Court which ordered "the President" of Djaygee to run the business with Diane excluded, and a receiver appointed. However, Gray never cooperated with the Receiver and did not pay bills for 3 months. The Receiver brought a Contempt Charge against Gray, which resulted in Gray seeking to settle the case. A settlement involved having Diane purchase Gray's interest in CES in March 2008. Later, in 2011, in a second lawsuit, Gray obtained a separate order appointing a receiver for the limited purpose of taking possession of certain assets of the business, but for a period of time who shut down the business and excluded Diane, while at the same time giving Gray access to the business.

On June 8, 2012, Diane filed her voluntary Chapter 13 bankruptcy petition with this court. During the course of this case, she has been in ongoing and continuous litigation with Gray. Further, during various trade shows that she has attended Gray has appeared (he conducts a similar business, and therefore tends to sing tradeshows), and has advised other people in the business that Diane is going out of business. The time, effort and expense of the process have prevented Diane from dedicating the necessary time to help the business grow and stabilize. This resulted in her searching for a purchaser of business, which she recently located. As set forth in this Disclosure Statement and Plan, details of the proposed purchaser set forth.

**B.**    **Insiders of the Debtor**

Diane is the single debtor in this case, and is unmarried, running the business of CES as a sole proprietor.

### C.       Management of the Debtor Before and During the Bankruptcy

During the two years prior to the date on which the bankruptcy petition was filed, no other person was in control of Diane or the business of CES.

The management of the Debtor's business during the Debtor's chapter 11 case has been Diane.

### D.       Significant Events During the Bankruptcy Case

During the course of this case, other than the adversary proceedings pending in this court, there have been relatively few significant issues to be noted.

During the course of the case, the Debtor, with approval of the court, has employed certain professionals to assist in the reorganization process and to assure compliance with all obligations.  This included the employment of counsel.

### F.       Projected Recovery of Avoidable Transfers

The Debtors do not intend to pursue preference, fraudulent conveyance, or other avoidance actions.  The Debtors are not aware of any facts that would give rise to claims for preference recoveries. The debtor is aware of certain facts giving rise to claims against John Gray, and those claims are being pursued in the adversary proceedings before the court.  Proceeds of those claims, if any, less expenses, will be used to fund the Plan.

### G.       Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article V of the Plan.

**H.      Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets as of the date of this Disclosure Statement are listed in Exhibit A.

The Debtors' most recent financial statement and projections are set forth in Exhibit B. This exhibit demonstrates the projected cash flow the debtor going forward in anticipation of the sale of her business assets will be allowed by the Court.

**III.    SUMMARY OF THE PLAN OF REORGANIZATION**

**A.      The Purpose of the Plan of Reorganization**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount and manner as provided by the Plan.

**B.      Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has *not* placed the following claims in any class:

1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtors' Chapter 11 cases, which expenses are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court. | $38,500 less retainer of $12,00.00 | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan. |
| Clerk's Office Fees | $0.00 | Paid in full on the effective date of the Plan |
| Other administrative expenses | $0.00 | Paid in full on the effective date of the Plan or according to separate written agreement. The Debtors are not aware of any other administrative expenses. |
| Office of the U.S. Trustee Fees | $375 | Paid in full on the effective date of the Plan |
| TOTAL | $26,875 | |

2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The Debtor does not have any priority tax claims.

**C.    Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.    *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under §506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtors' secured prepetition claims and their proposed treatment under the Plan:

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment | |
|---------|-------------|----------------------|------------|-----------|---|
| 1 | *Secured claim of*: Name = Hardwood Heights Condo Association<br><br>Collateral description = Windham, NH realty<br><br>Allowed Secured Amount = $1,692.04<br><br>Priority of lien = Condo lien, first priority<br><br>Total claim = Ongoing | No | Impaired | Monthly Pmt<br><br>Pmts Begin<br><br>Pmts End<br><br>Balloon pmt<br><br>Interest rate %<br>Treatment of Lien<br><br>Additional payment required to cure defaults | =$420.00<br><br>=12/1/2013<br><br>=12/1/2016<br><br>= $0.00<br><br>= 4.0%<br><br>= Retained<br><br>= $48.10 |
| 2 | *Secured claim of*: Name = Deutche Bank c/o Carrington Mortgage<br><br>Collateral description = Windham, NH realty<br><br>Allowed Secured Amount = $$183,089.19<br><br>Priority of lien = First mortgage, first priority<br><br>Total claim = $183,089.19 | No | Impaired | Monthly Pmt<br><br>Pmts Begin<br><br>Pmts End<br><br>[Balloon pmt]<br>Interest rate %<br>Treatment of Lien<br><br>[Additional payment required to cure defaults] | =$1,759.79<br><br>=6/1/2013<br><br>=6/1/2018<br><br>= $0.00<br><br>= 16.0%<br><br>= Retained<br><br>= $0.00 |

| 3 | *Secured claim of:*<br>Name =America's Servicing Co.<br><br>Collateral description = Windham, NH realty<br><br>Allowed Secured Amount = $0.00<br><br>Priority of lien = Second mortgage, second priority, wholly undersecured<br><br>Total claim = $27,551.58 | No | Impaired | Monthly Pmt = $0.00<br><br>Pmts Begin = 6/1/2013<br><br>Pmts End = 6/1/2018<br><br>Balloon pmt = $654,487.87<br><br>Interest rate % = 0.0%<br><br>Treatment of Lien = Stripped down |
| 4 | *Secured claim of:*<br>Name =Toyota Financial Services<br><br>Collateral description = 2012 Toyota Camry<br><br>Allowed Secured Amount = $19,666<br><br>Priority of lien = Security Interest, first priority<br><br>Principal owed = $19,666<br>Total claim = $19,666.00 | No | Impaired | Monthly Pmt = $358.92<br><br>Pmts Begin = 2/1/2012<br><br>Pmts End = 2/1/2017<br><br>Balloon pmt = None<br><br>Interest rate % = 5.0%<br>Treatment of Lien = Retained |
| 5 | *Secured claim of:*<br>Name =TD Bank<br><br>Collateral description = All Business Assets of CES<br><br>Allowed Secured Amount = $42,598.00<br><br>Priority of lien = Security Interest, first priority<br><br>Principal owed = $42,598<br>Total claim = $42,598 | No | Impaired | Monthly Pmt = $981.80<br><br>Pmts Begin = 3/1/2012<br><br>Pmts End = 12/1/2013<br><br>Balloon pmt = $42,598<br><br>Interest rate % = 8.25%<br>Treatment of Lien = Retained |

The liens of Household Bank and Crown Asset Management have already been stripped down by previous order of the court.  The caims of will be treated as Class 7 Unsecured claims.

    2.    *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

The Debtors are not aware of any such claims.

    3.    *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. The Debtors have two classes of unsecured claims, including a class for administrative convenience for claims equal to $1,000 or less.

The following chart identifies the Plan's proposed treatment of Classes 6 through 7, which contain general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 6 | §1122(b) Convenience Class | Impaired | Paid in full in cash on effective date of the Plan in an amount equal to $250 or $100% of allowed claim, whichever is less. |
| 7 | General Unsecured Class | Impaired | Monthly Pmt = $207.00<br>Pmts Begin = Effective date<br>Pmts End = 12/1/2016<br>Balloon pmt = $0.00<br><br>Interest rate % = 0.00%<br><br>Estimated percent of claim paid = Between .843% and 7.11% (estimated) |

The actual dividend to unsecured creditors will vary depending upon the actual amount of claims allowed. If all claims are allowed as filed, there would be a dividend of

about .843%, and if all claims are disallowed as per objections that the Debtor plans to file, then the dividend could be 7.11%.

The claims of John Gray are subject to state court appellate proceedings and other proceedings in this court. All distributions to which he may be entitled will be withheld until a final determination of his claims. If his claims are disallowed, funds otherwise payable to him will be distributed to other unsecured creditors on a pro-rata basis.

4. *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 8 | Equity interest holders | Unimpaired | Holders to retain their interests |

**D. Means of Implementing the Plan**

1. *Source of Payments*

Payments and distributions under the Plan will be funded by the following:

Plan payments will be funded from the sale of assets provided herein, as well as the future wages of the Debtor, to be paid for 36 months as provided in Exhibits B and C.

At the conclusion of the 3 year term of the Plan, plan payments will terminate.  All Plan payments will be made by the Debtor.

2.  *Sale of Business Assets*

Pursuant to the terms of the documents attached hereto and collectively marked as Exhibit D, Diane intends to sell all of her business assets, both tangible and intangible, to a Massachusetts corporation, R&S Designs Corporation ("R&S"). R&S is a corporation wholly owned by Scott Crowther and Rachel Welker. Rachel Welker is now and has been a long time employee of the debtor. She has no employment agreement or any restrictions on her employment. As the debtor expressed an interest in selling the business because of inadequate capital, Rachel Welker and Scott Crowther expressed an interest in the purchase of the business with the condition of continued employment of Diane on going forward basis. The full terms of the proposed transaction are set forth in the executed transaction documents referenced herein.

Based upon information available to the debtor, there should be no tax liability to the estate as a result of this transfer the debtor will no longer be involved in the management of the business other than as a consultant, and will provide assistance to the new business primarily in the form of sales and services. There are no other costs to the debtor or this estate associated with this transaction except as provided herein.

3.    *Post-confirmation Management*

On a Post-Confirmation basis, Diane will not be the owner of CES, but will manage business tasks as requested by the new owners and continue to manage her own personal affairs.

| Name | Affiliations | Insider (yes or no)? | Position | Compensation |
|------|-------------|---------------------|----------|-------------|
| Diane Tacason | Employee | Yes | Employee | $1,200 per week |

There are no other insiders to receive compensation.

**E.    Risk Factors**.

The proposed Plan has the following risks:

The ability of the Debtor to make plan payments is dependent upon the same risks and constraints of any wage earner, namely, the ability of her new employer to continue to make new sales, and to collect those funds on a timely basis.  Like any other person, the Debtor would bee free to seek other employment elsewhere, but not to compete with the buyer, R&S.

**F.    Executory Contracts and Unexpired Leases**

The Plan, in Section 5.01, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file

and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Section 5.01 will be assumed under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**G.      Tax Consequences of Plan**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors. The Debtors make no representations concerning the tax consequences to any particular party.*

**IV.      CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§1129(a) or (b) of the Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in §1129, and they are not the only requirements for confirmation.

**A.      Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

- 17 -

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 1 through 8 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that only unclassified claims are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtors' schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was February 13, 2013.**

2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in §1124 of the

Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

        3.     *Who is **Not** Entitled to Vote?*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- Holders of claims and equity interests that have been disallowed by an order of the Court;

- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- Holders of claims or equity interests in unimpaired classes;

- Holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- Holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- Holders of Administrative Claims.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

        4.     *Who Can Vote in More Than One Class?*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.**     **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan,

unless the Plan is eligible to be confirmed by cram down on non-accepting classes, as discussed later in Section B.2.

> 1.     *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half ($^1/_2$) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds ($^2/_3$) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

> 2.     *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by §1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a cram down plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of §1129(a)(8) of the Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

> ***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

## C.     Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation

analysis is attached to this Disclosure Statement as Exhibit A.  As set forth in the analysis, unsecured claims would receive no distribution in liquidation, and likely would receive substantially less as that figure does not take into consideration outstanding Chapter 11 administrative expenses, nor does it consider Chapter 7 administrative expenses, including but not limited to the costs of liquidation.

**D.      Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.      *Ability to Initially Fund Plan*

The Debtors believe that they will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit A as part of the liquidation analysis.

2.      *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that she will have enough cash over the life of the Plan to make the required Plan payments.  The Debtors have provided projected financial information.  Those projections are listed in Exhibit B.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

**V.      EFFECT OF CONFIRMATION OF PLAN**

**A.      DISCHARGE OF DEBTOR**

<u>Discharge.</u>  On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the

effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

**B.     Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan.  However, the Court may require a new disclosure statement and/or revoting on the Plan. The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.     Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

## VI.    OTHER PLAN PROVISIONS

None.

Respectfully submitted,

The Debtor
By her attorney,

Dated:  August 14, 2013

Michael B. Feinman
BBO#545935
Feinman Law Offices
23 Main Street
Andover, MA  01810
Tel:  978-475-0080
Fax: 978-475-0852
Email:mbf@feinmanlaw.com

Dated:  August 14, 2013

Diane Tacason

**EXHIBITS**

**Exhibit A** – Liquidation Analysis

| Assets | Asset Value | Liability Amount | Liabilities | Comment | Equity in Assets | Exempt Equity | Available to Creditors |
|---|---|---|---|---|---|---|---|
| Cash and Bank Accounts | $800.00 | | | | | | |
| Windham, NH property | $185,000.00 | $183,089.19 | Deutsche Bank | To be Stripped | $0.00 | $0.00 | $0.00 |
| | | $27,551.58 | Americas Servicing Co. | Stripped | | | |
| | | $0.00 | Judicial Lien | Stripped | | | $0.00 |
| | | $0.00 | Judicial Lien | | | | |
| Business Equipment | $25,000.00 | $42,598.00 | TD Bank | | | | |
| Inventory | $1,000.00 | | | | | | |
| Accounts Receivable | $11,000.00 | | | | | | |
| Household Furnishings | $3,000.00 | | | | $3,000.00 | $3,000.00 | $0.00 |
| Clothing | $2,000.00 | | | | $800.00 | $800.00 | $0.00 |
| Jewelry | $1,500.00 | | | | $500.00 | $500.00 | $0.00 |
| 2012 Toyota Camry | $20,000.00 | $18,093.22 | Auto Loan | Secured | $ 1,906.78 | $ 1,906.78 | $0.00 |
| Retirement Plan | $42,000.00 | | | | $42,000.00 | $42,000.00 | $0.00 |
| Items held by receiver | $3,000.00 | | | | | | |
| Claims against John Gray | unknown | $856,879.64 | Unsecured & Undersecured Claims | | | | |
| Total Assets | $294,300.00 | $1,128,211.63 | Total Liabilities | | $48,206.78 | $48,206.78 | $0.00 |

**Exhibit B** – Cash Projections

### 2013 Weekly Pay of Annual Income of $62,400.00

|                          | Amount      |
|--------------------------|-------------|
| gross pay                | $1,200.00   |
| federal income tax       | $145.36     |
| social security tax      | $74.40      |
| medicare tax             | $17.40      |
| state income tax         | $63.60      |
| city income tax          | $0.00       |
| deductions               | $0.00       |
| **final pay check**      | **$899.24** |
|                          |             |
| **Monthly**              | **$3,866.73** |
|                          |             |
| Mortgage                 | $1,759.79   |
| Condo fee                | $360.00     |
| Special Assessment       | $60.43      |
| Car payment              | $358.92     |
| DirecTV                  | $138.49     |
| Comcast                  | $160.41     |
| Eastern Propane*         | $115.00     |
| PSNH*                    | $80.00      |
| Homeowners Insurance     | $46.25      |
| P.O. Box rental          | $4.50       |
| Food*                    | $75.00      |
| Clothing*                | $50.00      |
| Medical & Dental* (diabetic, bp) | $125.00 |
| Entertainment            | $200.00     |
|                          |             |
| Total                    | $3,533.79   |
|                          |             |
| Excess                   | $332.94     |

**Exhibit C –** Plan Payments

|  |  | Initial Distribution | Periodic Plan Payment | Final Dividend |
|---|---|---|---|---|
| Cash | $ 20,000.00 |  |  |  |
| Admin Claims | $ 26,875.00 | $ 19,500.00 | $ 125.00 | 100% |
| Class 2 | $ 1,692.04 | $ - | $ 48.10 | 100% |
| Class 6 | $ 2,443.61 | $ 500.00 | $ - |  |
| Class 7 | $ 884,431.22 | $ - | $ 207.00 | 0.843% |
| Class 7 (alternate) | $ 104,805.85 |  | $ 207.00 | 7.110% |

**Exhibit D –** Asset Purchase Agreement

### ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") dated [＿＿＿＿＿], June 2013, is by and between Diane Tacason d/b/a Cutting Edge Sports, an individual conducting business at 1 Bryant Street, Woburn, Massachusetts ("Seller") and R&S Designs Corporation, a Massachusetts corporation with a usual place of business at 8 Linden Wood Road, Stoneham, Massachusetts 02180 ("Buyer").  Buyer desires to purchase and Seller wishes to sell to Buyer the Purchased Assets (as defined herein), subject to the terms and conditions set forth below. Accordingly, Buyer and Seller agree as follows:

# Article I
# Purchase and Sale

**Section 1.01 Purchase** and Sale of Assets. Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets related to the Seller's sport shirt design and customization business (such business, the "Purchased Business," and such assets, the "Purchased Assets"), free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("Encumbrance").  The Purchased Assets constitute all of the assets necessary to conduct the Purchased Business in the manner currently conducted by Seller. The Purchased Assets shall include, without limitation, the following relating to the Purchased Business:

    (a)    all proprietary software, firmware and hardware together with any works in progress, updates, upgrades and improvements;

    (b)    all assets, rights, tangible and intangible property used in or relating to the Purchased Business, including specifically but without limitation, all patents, patent applications, patents pending, and any rights related thereto;

    (c)    licenses;

    (d)    computer equipment, software, data, email addresses and accounts used in the Purchased Business;

    (e)    such books and records as are necessary to conduct the business of the Purchased Business exactly as it is now being conducted;

    (f)    internet protocol addresses, trade names, trademarks and service marks, mark registrations and applications, domain name registrations, web sites and related content, images and designs, copyrights, material that is subject to non-copyright protections, trade secrets, proprietary information, know how, technology, technical data, customer lists, client information and related client or user data, intellectual property rights acquired by license or agreement, telephone numbers, and all related goodwill and other rights; and

    (g)    all documentation related to any of the above.

**Section 1.02** No Liabilities. Seller represents that it has certain liabilities.  However, such liabilities shall be resolved pursuant to a pending proceeding with the United States Bankruptcy Court for the District of New Hampshire. Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created.

**Section 1.03** Purchase Price. The aggregate purchase price for the Purchased Assets shall be $65,0000.00 (the "Purchase Price"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined below) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by the Seller in writing to Buyer.  The purchase price shall be paid in the form of assumption of secured debt in the amount of $45,000.00 due and owing to TD Bank, along with a cash payment of $20,000.00 to be made at time of closing.

**Section 1.04** Allocation of Purchase Price. Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes as agreed by their respective accountants, negotiating in good faith and agree file all tax returns and information reports in a manner consistent with such allocation

**Section 1.05** Withholding or Transfer Tax. Buyer shall not deduct or withhold from the Purchase Price any taxes that Buyer may be required to deduct and withhold under any applicable tax law. All such withholding or transfer tax amounts shall be the responsibility of the Seller pursuant to pending Bankruptcy Court proceedings.

# Article II
# Closing

**Section 2.01** Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place within fourteen (14) days of the date of approval of this Agreement by the United States Bankruptcy Court for the District of New Hampshire (the "Closing Date") at the offices of Buyer's counsel, or at such other time and/or place as shall be mutually agreed upon by the Buyer and the Seller. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 2.02** Closing Deliverables

    (a)    At the Closing, Seller shall deliver to Buyer the following:

        (i)    a bill of sale in the form of <u>Exhibit A</u> hereto (the "Bill of Sale") and duly executed by Seller, transferring the Purchased Assets to Buyer;

        (ii)    an assignment of intellectual property in the form of <u>Exhibit B</u> hereto (the "Intellectual Property Assignment") and duly executed by Seller, transferring all of Seller's right, title and interest in and to the Purchased Assets to Buyer;

        (iii)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder; and

        (iv)    a certified copy of Order of the United States Bankruptcy Court for the District of New Hampshire approving the sale of assets as contemplated herein, free and clear of all liens, claims, interests and encumbrances.

        (v)    an Employment Agreement for Diane Tacason, with non-competition provisions, in the form attached hereto.

    (b)    At the Closing, Buyer shall deliver to Seller the Purchase Price.

    (c)    Prior to closing, Seller shall have obtained Bankruptcy Court approval for the sale based upon the following procedures:

        (i)    A bid in excess of the Buyer's bid will be required to be made in an amount not less than $5,000.00 than the current bid.

        (ii)    Any overbid must be upon the same identical terms and conditions, and would require a deposit in cash for the entire purchase price pursuant to the overbid equal to 10% of the total amount of the bid.

(iii)    In the event of any overbid, there shall be an auction at the Bankruptcy Court that will have as participants only those persons that have submitted qualifying timely bids. Any qualifying bid must be submitted on or before fourteen (14) days prior to the hearing the proposed sale, as such hearing date is established by the Bankruptcy Court.

(iv)    In the event that R&S Designs Corporation is not the successful bidder at the auction sale, then the bankruptcy estate would be obligated to R&S Designs Corporation in an amount equal to its costs and expenses incurred in connection with the transaction, but in any event not less than $3,000.00 no more than $5,000.00.  Qualifying costs and expenses would be attorney's fees, associate expenses, travel expenses, and loss wages and time incurred by employees of R&S Designs Corporation.

(d)    Prior to closing, Seller shall have consent to the sale and assumption of debt owed to it by Buyer.

# Article III
# Representations and Warranties of seller

Seller represents and warrants to Buyer that the statements contained herein are true and correct as of the date hereof. Seller further represents and warrants that she is the owner of the Purchased Assets, and subject to Bankruptcy Court approval, fully authorized to transfer same to the Buyer.

**Section 3.01** Authority of Seller.  Upon Bankruptcy Court approval, Seller will have full power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.

**Section 3.02** No Conflicts. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a)  violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (b) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (c) result in the creation or imposition of any Encumbrance on the Purchased Assets.

**Section 3.03** No Consents. Other than approval of the United States Bankruptcy Court for the District of New Hampshire, no consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby. No consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.04** Title to Purchased Assets. Seller owns and has good title to the Purchased Assets, free and clear of Encumbrances, other than the secured claims of TD Bank as disclosed to Buyer.

**Section 3.05** Liabilities. Seller has liabilities, both fixed, contingent and otherwise.  All Seller's liabilities will remain with Seller. Buyer assumes no responsibilities for any of Seller's liabilities.

**Section 3.06** Intellectual Property

(a)    "Intellectual Property" means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) internet domain name registrations; and (vi) other intellectual property and

related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing).

(b)     The Purchased Assets include all of the Intellectual Property owned by the Seller that is necessary or desirable for conducting the Purchased Business in the manner it is presently being conducted ("Purchased IP Assets"). Seller owns or has adequate, valid and enforceable rights to use all the Purchased IP Assets, free and clear of all Encumbrances. Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP Assets, or restricting the licensing thereof to any person or entity. With respect to any registered Intellectual Property included in the Purchased IP Assets, (i) all such Intellectual Property is valid, subsisting and in full force and effect and (ii) Seller has paid all maintenance fees and made all filings required to maintain Seller's ownership thereof.

(c)     Seller's prior and current use of the Purchased IP Assets has not and does not infringe, violate, dilute or misappropriate the Intellectual Property of any person or entity and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness or use of the Purchased  Assets. No person or entity is infringing, misappropriating, diluting or otherwise violating any of the Purchased IP Assets, and neither Seller nor any affiliate of Seller has made or asserted any claim, demand or notice against any person or entity alleging any such infringement, misappropriation, dilution or other violation.

**Section 3.07** Non-foreign Status. Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.08** Compliance With Laws Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets.

**Section 3.09** Legal Proceedings. There is no claim, action, suit, proceeding or governmental investigation ("Action") of any nature pending or threatened against or by Seller (a) relating to or affecting the Purchased Assets; or (b) that challenges or seeks to prevent the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.10** Brokers. No broker, finder or investment banker is entitled to any fee or commission in connection with this Agreement or the transactions contemplated herein.

**Section 3.11** Full Disclosure. No representation or warranty by Seller in this Agreement and no statement contained in any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# Article IV
# Representations and Warranties of buyer

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01** Organization and Authority of Buyer; Enforceability. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the documents to be delivered

hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

# Article V
# Indemnification

**Section 5.01** Survival. All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 5.02**  Title Transfer  By Seller. Subject to the  terms and conditions of this Article V, Seller shall transfer title to Buyer of the Purchased Assets as is and where is.  However, Seller shall cause the assets to be sold free and clear of all liens, claims, interests and encumbrances as permitted by the Bankruptcy Code and as authorized by the United States Bankruptcy Court for the District of New Hampshire.

# Article VI
# Miscellaneous

**Section 6.01** Expenses. All costs and expenses incurred in connection with this Agreement and any related transactions shall be the responsibility of the party incurring such amounts.

**Section 6.02** Notices. All notices and other communications pursuant to this agreement shall be in writing (including electronically), sent to the below-listed addresses, as updated by the parties, and will be deemed given (a) when received by the addressee (with confirmation of receipt from the deliverer); (b) on the date sent by e-mail with reply confirmation; or (c) on the third day after the date mailed by certified mail (with return receipt).

Notice Addresses:

|  |  |
|---|---|
|  | Diane Tacason |
| If to Seller: | E-mail: episgirl@aol.com |
|  |  |
|  | Feinman Law Offices |
| with a copy to: | E-mail: mbf@feinmanlaw.com |
|  | Attention: Michael B. Feinman |
|  | R&S Designs Corporation |
| If to Buyer: | E-mail: |
|  | Attention: |
|  | Timothy P. Smith, Esq. |
| with a copy to: | E-mail: tpatsmith@aol.com |

**Section 6.03** Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 6.04** Entire Agreement – Applicable Law.   This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder (including the Exhibits), the statements in the body of this Agreement will control. The parties agree that this Agreement shall be governed pursuant to the laws of the Commonwealth of Massachusetts.

**Section 6.05** Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 6.06** Amendment, Modification and Waiver. This Agreement may be amended, modified or supplemented, and any provision hereof shall be waived, only by an agreement in writing signed by each party hereto. No delay in exercising any right or remedy hereunder shall be construed as a waiver thereof.

**Section 6.07** Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. Facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as an original signed copy.

**Section 6.08**  Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees incurred in connection with this Agreement shall be paid by Seller when due. Seller shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees.

The parties hereby agree, as evidence by the signatures below of respective duly-authorized officers.

Name: Diane Tacason

Title:

Date: 8·13·2013

R&S Designs Corporation

By:

Name:

Title: President

Date: 8|13|13


**Exhibits**

Exhibit A - Bill of Sale

Exhibit B – Intellectual Property Assignment

Exhibit C – Employment Agreement with Non-Compete

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**") is made as of the ___ day of _____, 2013, between R&S DESIGNS CORPORATION, a Massachusetts corporation (the "**Company**"), and Diane Tacason (the "**Executive**").

WHEREAS, the Company desires to employ the Executive and the Executive desires to be employed by the Company on the terms set forth herein beginning on the date hereof (the "**Commencement Date**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Position, Duties and Term. The Executive shall serve as the Chief Operating Officer ("**COO**") of the Company, reporting to the Company's Chief Executive Officer ("**CEO**"). The Executive shall perform the duties of COO, and any other duties the CEO or Board of Managers ("**Board**") deem appropriate in their reasonable discretion and consistent with the typical duties of a COO of similar companies.   The term of this Agreement shall be one (1) year from the date hereof (the "**Initial Term**") and shall automatically renew for successive one-year periods (each, a "**Renewal Period**" and together with the Initial Term, the "**Term**") unless either party serves notice of termination at least thirty (30) days prior to the end of the Initial Term or applicable Renewal Period.

2.  Compensation and Related Matters.

    (a)  Base Salary.  The Executive's initial full time annual base salary shall be _____ Dollars ($ 62,400. ).  The Company may increase, but may not decrease, such Base Salary (as defined below) on annual review of the Executive's performance. The base salary in effect at any given time is referred to herein as "**Base Salary.**"  The Base Salary shall be payable in a manner that is consistent with the Company's usual payroll practices for senior executives.

    (b)  Expenses.  The Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by her in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company for its senior executive officers.

    (c)  Other Benefits.  The Executive shall be entitled to participate in or receive benefits under all of the Company's Employee Benefit Plans in effect on the date hereof, or under plans or arrangements that provide the Executive with benefits at least substantially equivalent to those provided, from time to time, under such Employee Benefit Plans.  As used herein, the term "**Employee Benefit Plans**" includes, without limitation, each retirement plan; supplemental pension, retirement and deferred compensation plan; savings and profit-sharing plan; stock ownership plan; stock purchase plan; stock option plan; life insurance plan; medical insurance plan; disability plan; paid time off or sick leave policy, and health and accident plan or arrangement established and maintained by the Company on the date hereof for employees of the

same status within the hierarchy of the Company.  The Executive shall be entitled to participate in or receive benefits under any employee benefit plan or arrangement which may, in the future, be made available by the Company to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plan or arrangement.  Any payments or benefits payable to the Executive under a plan or arrangement referred to in this Section 2(e) in respect of any calendar year during which the Executive is employed by the Company for less than the whole of such year shall, unless otherwise provided in the applicable plan or arrangement, be prorated in accordance with the number of days in such calendar year during which he is so employed.  Should any such payments or benefits accrue on a fiscal (rather than calendar) year, then the proration in the preceding sentence shall be on the basis of a fiscal year rather than calendar year.

(d)  <u>Vacations</u>.  The Executive shall be entitled to accrue up to twenty one (21) paid vacation days in each year, which shall be accrued ratably.  The Executive shall also be entitled to all paid holidays given by the Company to its executives.

3.  <u>Termination</u>.  The Executive's employment hereunder may be terminated without any breach of this Agreement under the following circumstances:

(a)  <u>Death</u>.  The Executive's employment hereunder shall terminate upon her death.

(b)  <u>Disability</u>.  The Company may terminate the Executive's employment if she is disabled and unable to perform the essential functions of the Executive's then existing position or positions under this Agreement with reasonable accommodation for a period of ninety (90) days (which need not be consecutive) in any twelve-month period.  If any question shall arise as to whether during any period the Executive is disabled so as to be unable to perform the essential functions of the Executive's then existing position or positions with reasonable accommodation, the Executive may, and at the request of the Company shall, submit to the Company a certification in reasonable detail by a physician selected by the Company to whom the Executive or the Executive's guardian has no reasonable objection as to whether the Executive is so disabled or how long such disability is expected to continue, and such certification shall for the purposes of this Agreement be conclusive of the issue.  The Executive shall cooperate with any reasonable request of the physician in connection with such certification.  If such question shall arise and the Executive shall fail to submit such certification, the Company's determination of such issue shall be binding on the Executive.  Nothing in this Section 3(b) shall be construed to waive the Executive's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*

(c)  <u>Termination by Company for Cause</u>.  The Company may terminate the Executive's employment hereunder for Cause at any time.  For purposes of this Agreement, "**Cause**" shall include, but shall not be limited to: (i) the commission, arrest or conviction by the Executive of any crime by the Executive that the Company, in its discretion, expects to result in material injury or reputational harm to the Company or any of its subsidiaries and affiliates if he were retained in his position; (ii) material non-performance by the Executive of his duties hereunder (other than by reason of the Executive's physical or mental illness, incapacity or

2

disability); or (iii) a material breach or misrepresentation by the Executive of any of the provisions contained in this Agreement.

(d)     Notice of Termination.  Except for termination as specified in Section 3(a), any termination of the Executive's employment by the Company or any such termination by the Executive shall be communicated by written Notice of Termination to the other party hereto.  For purposes of this Agreement, a "**Notice of Termination**" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon.

(e)     Date of Termination.  "**Date of Termination**" shall mean:  (i) if the Executive's employment is terminated by her death, the date of her death; (ii) if the Executive's employment is terminated on account of disability under Section 3(b) or by the Company for Cause under Section 3(c), the date on which Notice of Termination is given; (iii) if the Executive's employment is terminated by the Company under Section 3(d), 30 days after the date on which a Notice of Termination is given; and (iv) if either the Executive or the Company elects not to renew this Agreement, the date on which the Term or the Renewal Period expires, as applicable.

4.     Compensation Upon Termination.

(a)     Termination Generally.  If the Executive's employment with the Company is terminated for any reason, the Company shall pay or provide to the Executive (or to her authorized representative or estate) any earned but unpaid Base Salary, Bonus and Commission Fees earned but not yet paid in accordance with Section 2(a), 2(b) and 2(c), unpaid expense reimbursements, accrued but unused vacation and any vested benefits the Executive may have under any employee benefit plan of the Company (the "**Accrued Benefit**") on or before the time required by law but in no event more than 30 days after the Executive's Date of Termination, except with respect to any Bonus or Commission Fees which must be calculated as of a later time, which shall be paid as soon as reasonably practicable following such determination.

5.     Section 409A.

(a)     Anything in this Agreement to the contrary notwithstanding, if at the time of the Executive's separation from service within the meaning of Section 409A of the Code, the Company determines that the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that the Executive becomes entitled to under this Agreement on account of the Executive's separation from service would be considered deferred compensation subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after the Executive's separation from service, or (B) the Executive's death.  If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.

(b)     All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement.  All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred.  The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year.  Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(c)     To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon the Executive's termination of employment, then such payments or benefits shall be payable only upon the Executive's "separation from service."  The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h).

(d)     The parties intend that this Agreement will be administered in accordance with Section 409A of the Code.  To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code.  The parties agree that this Agreement may be amended, as reasonably requested by either party, and as may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without additional cost to either party.

(e)     The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

6.     <u>Arbitration of Disputes</u>.  Any controversy or claim arising out of or relating to this Agreement or the breach thereof or otherwise arising out of the Executive's employment or the termination of that employment (including, without limitation, any claims of unlawful employment discrimination whether based on age or otherwise) shall, to the fullest extent permitted by law, be settled by arbitration in any forum and form agreed upon by the parties or, in the absence of such an agreement, under the auspices of the American Arbitration Association ("**AAA**") in Boston, Massachusetts in accordance with the Employment Dispute Resolution Rules of the AAA, including, but not limited to, the rules and procedures applicable to the selection of arbitrators.  In the event that any person or entity other than the Executive or the Company may be a party with regard to any such controversy or claim, such controversy or claim shall be submitted to arbitration subject to such other person or entity's agreement.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  This Section 6 shall be specifically enforceable. Notwithstanding the foregoing, this Section 6 shall not preclude either party from pursuing a court action for the sole purpose of obtaining a temporary restraining order or a preliminary injunction in circumstances

4

in which such relief is appropriate; provided that any other relief shall be pursued through an arbitration proceeding pursuant to this Section 6.

7.     Consent to Jurisdiction.  To the extent that any court action is permitted consistent with or to enforce Section 6 of this Agreement, the parties hereby consent to the jurisdiction of the United States District Court for the District of Massachusetts.

8.     Withholding.  All payments made by the Company to the Executive under this Agreement shall be net of any tax or other amounts required to be withheld by the Company under applicable law.

9.     Successor to the Executive.  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal representatives, executors, administrators, heirs, distributees, devisees and legatees.  In the event of the Executive's death after her termination of employment but prior to the completion by the Company of all payments due her under this Agreement, the Company shall continue such payments to the Executive's beneficiary designated in writing to the Company prior to her death (or to her estate, if the Executive fails to make such designation).

10.    Enforceability.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.    Survival.  The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the **Executive**'s employment to the extent necessary to effectuate the terms contained herein.

12.    Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

13.    Notices.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the Board.

14.    Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

15.    <u>Governing Law</u>.  This Agreement shall be construed under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without giving effect to the conflict of laws principles thereof.

16.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document.

17.    <u>Successor to Company</u>.  The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company expressly to assume and agree to perform this Agreement to the same extent that the Company would be required to perform it if no succession had taken place.  Failure of the Company to obtain an assumption of this Agreement at or prior to the effectiveness of any succession shall be a material breach of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the date and year first above written.

R&S DESIGNS CORPORATION

By: _____

Name:

Title:

EXECUTIVE

_____

Diane Tacason, an individual

EXHIBIT A

Non-Competition Agreement

## NONCOMPETITION AGREEMENT

This Noncompetition Agreement (this "Agreement") is being executed and delivered as of _____, 2013 (the "Effective Date") by Diane Tacason ("Seller"), in favor of and for the benefit of R&S Designs Corporation, a Massachusetts corporation ("Buyer"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement (defined below).

W I T N E S S E T H :

WHEREAS, pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of May 1, 2013, by and among Buyer, on the one hand; and Seller on the other hand, Buyer is acquiring from Seller the Purchased Assets; and

WHEREAS, it is a condition to the consummation of the transactions contemplated by the Purchase Agreement that a non-competition agreement be executed and delivered by Seller.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein, and for other good and valuable consideration the receipt of which is hereby acknowledged, and intending to be legally bound, the parties agree as follows:

A G R E E M E N T

1.       Acknowledgments by Seller. Seller acknowledges that, in connection with the acquisition of the Purchased Assets by Buyer, Seller has agreed to enter into this Agreement as an inducement for Buyer to enter into the Purchase Agreement. Seller furthermore acknowledges that the promises and restrictive covenants that Seller is providing in this Agreement are reasonable and necessary to the protection of the Business and Buyer's legitimate interests in acquiring the Purchased Assets pursuant to the Purchase Agreement.

2.       Noncompetition.

(a)       As an inducement for Buyer to enter into the Purchase Agreement, and as additional consideration for the consideration to be paid Seller under the Purchase Agreement, Seller agrees that until the fourth anniversary of the Effective Date (the "Restrictive Period"), Seller shall not, without the prior written consent of the Buyer, in any jurisdiction within the Restricted Territories (as defined below):

(i)       directly or indirectly, alone or with others, engage in a business which is Directly Competitive (as defined below);

(ii)       be or become an officer, director, stockholder, owner, corporate affiliate, co-owner, partner, member, trustee, promoter, founder, investor or lender, consultant, advisor or executive of or to, or otherwise acquire or hold any controlling interest in or otherwise engage in the providing of service (whether or not for compensation) to, any person or entity that engages in a business that is Directly Competitive (provided that

-1-

the foregoing shall not prohibit Seller from engaging in any of such activities for any person or entity whose primary business is not Directly Competitive, so long as Seller's activities with respect thereto are unrelated to any Directly Competitive activities); or

(iii)    permit Seller's name to be used in connection with a business that is Directly Competitive; and

(iv)    Use any intellectual property or Confidential Information (as defined below) of Seller.

provided, however, that nothing in this Section 2 shall prevent Seller from owning as a passive investment less than one percent (1%) of the outstanding shares of the capital stock of a publicly held corporation if Seller is not otherwise associated directly or indirectly with such corporation or any affiliate of such corporation.

(b)    For purposes of this Agreement, "Restricted Territories" means, every geographic area or territory within the continental United States; and "Directly Competitive" means a business that is engaged in the business of offering, marketing, soliciting or selling sports shirts for teams currently doing business with the Seller.

(c)    The parties acknowledge that the covenants contained in this Section 2 hereof are reasonable in geographical and temporal scope and in all other respects. The parties hereto intend that the covenants set forth in this Section 2 hereof shall be construed as a series of separate covenants. It is the desire and intent of the parties hereto that the provisions of this section shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If any particular provision or portion of the covenants of this Section 2 shall be adjudicated to be invalid or unenforceable, such adjudication shall apply only with respect to the operation of the covenant in the particular jurisdiction in which such adjudication is made.

3.    Nonsolicitation.  Seller further agrees that during the Restrictive Period:

(a)    Seller will not directly or indirectly divert, induce, hire, or solicit away employees, representatives, independent contractors, other personnel or consultants of Buyer for Seller's own benefit or for the benefit of any other person or entity; provided, however, that Seller may contact any such employees for any business which is not Directly Competitive.

(b)    Seller will not directly or indirectly, divert, induce, solicit away or attempt to divert, induce, hire or solicit away actual or prospective customers or independent sales organizations ("ISOs") or merchants of Buyer or any of its Affiliates (including, but not limited to, Platinum Wireless, Inc.), or of Seller, as of the Closing Date or any of its subsidiaries; provided, however, that Seller may contact any such actual or prospective customers for any business which is not Directly Competitive.

4.  Noninterference.  Seller further agrees that during the Restrictive Period Seller will not directly or indirectly, induce or attempt to induce any customer, ISO, supplier, manufacturer, financier, government agency, independent contractor, developer, promoter or other person having any business or regulatory relationship with Seller (or with Buyer and any of its Affiliates) as of the Closing Date to cease, reduce or alter the nature, amount or terms of business conducted or regulatory oversight or practices followed with respect to the Buyer or to engage in any business, regulatory or other activity which might materially harm the Buyer or which is opposed by the Buyer.

5.  Confidentiality.

(a)  Seller acknowledges that he has held a sensitive and confidential position with Seller as of the Closing Date and that, by virtue of having held such position, he has had access to and has learned Seller's confidential and proprietary information and trade secrets pertaining to its past, present, planned or projected operations, results of operations, prospects, processes, know-how, services, projects, strategies, techniques, procedures, financial capabilities, assets, transactions, customer information, vendor pricing, commission and customer pricing information, partners, financing sources and personnel, disclosure of any of which to present or future competitors, investors, partners or the general public would be highly detrimental to the best interests of the Buyer. All such confidential and proprietary information to which Seller has had prior access as a result of his position with Seller, and all similar information to which Seller may have access in the future as a result of his continuing employment with the Buyer are herein referred to as "Confidential Information." For purposes of this Section 5, "Confidential Information" does not include (i) information which is or becomes generally available to the public or in the industry of the Buyer other than as a result of an unauthorized disclosure by Seller; (ii) is received by the Seller in good faith and without restriction from a third party not under a confidentiality obligation to the Buyer and having the right to make such disclosure; or (iii) Seller can demonstrate is independently developed by or for the Seller without use or reference to the Confidential.

(b)  Without limiting any obligations of Seller arising at law or pursuant to any existing agreement to which Seller is bound or lawful order of any court or governmental agency, Seller covenants and agrees to and in favor of Buyer that, subject to the further provisions of this Agreement, Seller shall not disclose any Confidential Information to any person other than in connection with employment services provided by Seller to the Buyer or its affiliates, and Seller shall not use for his own purposes or for any other purpose other than those of the Buyer any Confidential Information at any time. Without limiting the generality of the foregoing, Seller agrees that, except as permitted by Buyer, he will not respond to or in any way participate in or contribute to any public discussion, notice or other publicity in any way that reveals or would reasonably be likely to reveal, material Confidential Information. Seller agrees that any material disclosure by him of any of the Confidential Information shall constitute a material breach of this Agreement.

6.  Specific Performance. Seller agrees that in the event of any material breach or threatened material breach by Seller of any covenant, obligation or other provision

contained in this Agreement, Buyer shall be entitled (in addition to any other remedy that may be available to it), to the extent permitted by applicable law, to obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant, obligation or other provision and (b) an injunction restraining such breach or threatened breach without the need to show actual damages.

7.      Non-Exclusivity. The rights and remedies of Buyer hereunder are not exclusive of or limited by any other rights or remedies which Buyer may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of Buyer hereunder, and the obligations and liabilities of Seller hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, misappropriation of trade secrets and the like.

8.      Arbitration.

(a)      To the fullest extent permitted by law, Seller and Buyer agree to the binding arbitration of any and all controversies, claims or disputes between them arising out of or in any way related to this Agreement.  For the purpose of Section 8 hereof, references to "Buyer" include Buyer's Affiliates and their respective employees, supervisors, officers, directors, agents, fiduciaries, administrators, affiliates and all successors and assigns of any of them, and this agreement to arbitrate shall apply to them to the extent Seller's claims arise out of or relate to their actions on behalf of Buyer.

(b)      To commence any such arbitration proceeding, the party commencing the arbitration must provide the other party with written notice of any and all claims forming the basis of such right in sufficient detail to inform the other party of the substance of such claims.  In no event shall this notice for arbitration be made after the date when institution of legal or equitable proceedings based on such claims would be barred by the applicable statute of limitations.  The arbitration will be conducted in Massachusetts by a single neutral arbitrator and in accordance with the then-current rules for resolution of employment disputes of the Judicial Arbitration & Mediation Services ("JAMS").  The Arbitrator is to be selected by the mutual agreement of the parties hereto.  If the parties cannot agree, the Superior Court will select the arbitrator. The parties are entitled to representation by an attorney or other representative of their choosing.  The arbitrator shall have the power to enter any award that could be entered by a judge of the trial court of the Commonwealth of Massachusetts, and only such power, and shall follow the law.  The award shall be binding and the parties hereto agree to abide by and perform any award rendered by the arbitrator.  The arbitrator shall issue the award in writing and therein state the essential findings and conclusions on which the award is based.  Judgment on the award may be entered in any court having jurisdiction thereof.  Non-prevailing party in the arbitration shall bear the costs of the arbitration filing and hearing fees and the cost of the arbitrator and actual attorneys fees and costs incurred in connection with such arbitration.

9.      Notices. Any notice or other communication required or permitted to be delivered to Seller or Buyer under this Agreement shall be in writing and shall be deemed

properly delivered, given and received when delivered in accordance with the terms of the Purchase Agreement.

10.    Severability. If any provision of this Agreement or any part of any such provision is held under any circumstances to be invalid or unenforceable in any jurisdiction, then (a) such provision or part thereof shall, with respect to such circumstances and in such jurisdiction, be deemed amended to conform to applicable laws so as to be valid and enforceable to the fullest possible extent, (b) the invalidity or unenforceability of such provision or part thereof under such circumstances and in such jurisdiction shall not affect the validity or enforceability of such provision or part thereof under any other circumstances or in any other jurisdiction, and (c) such invalidity or enforceability of such provision or part thereof shall not affect the validity or enforceability of the remainder of such provision or the validity or enforceability of any other provision of this Agreement and is separable from every other part of such provision.

11.    Governing Law. This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the Commonwealth of Massachusetts, without giving effect to principles of conflicts of laws.

12.    Waiver. No good faith failure on the part of Buyer to exercise any power, right, privilege or remedy under this Agreement, and no good faith delay on the part of Buyer in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

13.    Captions. The captions contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

14.    Entire Agreement. This Agreement, together with Seller's employment Agreement with Buyer, sets forth the entire understanding of Seller and Buyer relating to the subject matter hereof and thereof and supersedes all prior agreements and understandings between any of such parties relating to the subject matter hereof and thereof.

15.    Amendments. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Buyer and by Seller.

16.    Assignment. This Agreement and all obligations hereunder are personal to Seller and may not be transferred or assigned by Seller at any time. Buyer may assign its rights under this Agreement in whole or in part, without the consent or approval of the Seller or any other person or entity.

17.    Effective Date. This Agreement shall become effective on the Effective Date.

18.     <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

19.     <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be deemed and original, and all of which, when taken together, shall constitute but one and the same agreement.

20.     <u>Attorney Fees.</u> In the event of any action at law or in equity between the parties hereto to enforce any of the provisions hereof, the unsuccessful party to such litigation shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred therein by such successful party; and if such successful party shall recover judgment in any such action or proceeding, such costs, expenses and reasonable attorneys' fees may be included in and as part of such judgment.

IN WITNESS WHEREOF, the parties here executed this Agreement as of the date first above written.

_____
Diane Tacason

R&S Designs Corporation

By:_____
, President

-6-